Roy ROMER, Governor of the State of Colorado; The Department of Human Services, State of Colorado; Barbara McDonnell, in her official capacity as the Executive Director of the Department of Human Services; The State Board of Human Services; and Bruce D. Bass, Dr. Carole Custer, Shirley M. Baty, Cami Learned, Shirl McGuire–Beldin, and Youlon D. Savage, in their official capacities as members of the State Board of Human Services, Petitioners,

v.

The BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PUEBLO, COLORADO, Respondent.

No. 96SC626.

Supreme Court of Colorado,
En Banc.

April 6, 1998.

As Modified on Denial of Rehearing
April 27, 1998.

---

Gale A. Norton, Attorney General, Martha Phillips Allbright, Chief Deputy Attorney General, Richard A. Westfall, Solicitor General, Paul Farley, Deputy Attorney General, Wade Livingston, First Assistant Attorney General, State Services Section, Denver, for Petitioners.

Wm. David Lytle, Special Assistant County Attorney, Terry A. Hart, Clifford J. Hofmann, Jr., Pueblo, for Respondent.

Justice SCOTT delivered the Opinion of the Court.

In *Board of County Commissioners v. Romer*, 931 P.2d 504 (Colo.App.1996), we granted certiorari to decide a single question: Does a county department of social services have standing to compel the State Department of Human Services to reduce statewide social services expenditures?[1] We hold that it does not.

In *Romer*, the court of appeals, concluding that the county has exclusive control over its own budgetary and financial matters and that current state expenditures would result in a deficit, determined that the county "has statutory authority to seek judicial review of the Department's actions." *Id.* at 508–09. Because we see no such legislative grant of authority to counties of an express right to seek judicial review of the actions of a superior state agency, we disagree. We hold that a county does not have standing to obtain judicial review of the actions of the state department, a superior agency, in order to reduce social services expenditures. Accordingly, we reverse the judgment of the court of appeals.

## I. Factual and Legal History

The petitioners before us are trial defendants Roy Romer, Governor of the State of

---

1. Our order set forth the following question: "Whether a Board of County Commissioners has standing to sue the Governor and the Department of Human Services to obtain a reduction in social services expenditures."

Colorado; the Department of Human Services; Barbara McDonnell, the Executive Director of the Department of Human Services; and the State Board of Human Services and its members in their official capacity (collectively, the "Department").[2] The plaintiff in the trial court and the respondent before us is the Pueblo County Board of County Commissioners (County). Before discussing the facts of this case, we briefly review Colorado public assistance law.

### A. Colorado Public Assistance Law

Under the Colorado Human Services Code, §§ 26–1–101 to –201, 8 C.R.S. (1997) (Human Services Code), the costs of our state public assistance programs are shared by the federal government, the county, and the state.[3] *See Colorado Dep't of Soc. Servs. v. Board of County Comm'rs*, 697 P.2d 1, 6 (Colo.1985). State and county agencies have "funding responsibility together with general state control over public assistance programs," *Colorado Dep't of Soc. Servs.*, 697 P.2d at 5, which include medical assistance, adult foster care programs, child welfare services, programs for the aging, and programs established pursuant to the Colorado Medical Assistance Act. *See* § 26–1–109, 8 C.R.S. (1997).

Under current law, eighty percent of the overall program and administrative costs of public assistance are paid by the federal government and the state; the remaining twenty percent are paid by the county. *See* § 26–1–122(1)(d), (3)(b), (4)(b), 8 C.R.S. (1997); *Colorado Dep't of Soc. Servs.*, 697 P.2d at 6. The funds representing the county's twenty percent contribution are collected from the proceeds of an ad valorem tax

levied on property located within the county. *See* § 26–1–125, 8 C.R.S. (1997); *Colorado Dep't of Soc. Servs.*, 697 P.2d at 7. The county's contribution to the costs of public assistance programs results from the social services mill levy, the proceeds of which are maintained in a county social services fund. *See* § 26–1–123, 8 C.R.S. (1997).

A county's share of the program costs varies from program to program. For example, the state bears the entire cost of Old Age Pension payments, *see* Colo. Const. art XXIV; Low Income Energy Assistance Program costs are financed entirely by the federal government, *see* § 26–2–122.5, 8 C.R.S. (1997); while the county pays five percent of the program costs of the aid to the needy, disabled home care, and adult foster care programs, *see* § 26–1–122(4)(e), 8 C.R.S. (1997).

As might be expected in a state of urban as well as rural and agricultural centers, the funding burden for these statewide programs does not operate equally among the various counties. Some counties have residents with greater social services needs than others, while some counties have taxable property with much greater value than other counties. As a result, some counties must impose taxes at a higher mill levy than their sister counties in order to generate sufficient funds to pay their share of administrative and program costs. *See* §§ 26–1–123, 26–1–125, and 26–1–126, 8 C.R.S. (1997).

Addressing this inequality, the General Assembly created a county contingency fund (Contingency Fund) to provide additional state funds to counties with relatively greater social services needs but a relatively lower

**2.** The pleadings set forth Bruce D. Bass, Dr. Carole Custer, Shirley M. Baty, Cami Learned, Shirl McGuire–Beldin, and Youlon D. Savage as members of the State Board of Human Services. We also note that, initially, the Department was identified as the Department of Social Services. However, effective July 1, 1994, the General Assembly restructured and redesignated the Department of Social Services as the Department of Human Services. The Social Service Code, §§ 26–1–101 to –128, 11B C.R.S. (1989), was redesignated as the Human Services Code, §§ 26–1–101 to –201, 11B C.R.S. (1995). In doing so, the General Assembly expressly provided that no suit, action, or other proceeding com-

menced prior to the effective date of the statutory changes against the newly created Department of Human Services or its officers "shall abate by reason of the transfer of duties and functions from the [Department of Social Services] to the department of human services." § 26–1–105.5(7), 8 C.R.S. (1997). *See Board of County Comm'rs v. Romer*, 931 P.2d 504, 506 (Colo.App. 1996).

**3.** For an overview of the history of public assistance programs in Colorado, see *Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1, 5–9 (Colo.1985).

assessed value of taxable property. *See* § 26–1–126. In essence, as is relevant to Pueblo County and the case before us, the contingency fund statute, section 26–1–126, provides that if Pueblo County imposes a property tax of 3.0 or greater mill levy and the proceeds of such a tax do not generate sufficient funds to pay the county's obligations as set forth in section 26–1–122, 8 C.R.S. (1997), or, generally, the twenty percent share of administration and public assistance program costs, the county is eligible for payments from the Contingency Fund. *See* § 26–1–126(2); *Colorado Dep't of Soc. Servs.*, 697 P.2d at 8. Under the funding scheme of the Contingency Fund, however, the state is only obligated to advance fifty percent of the difference between the county's obligation and monies raised by the social services mill levy (the shortfall). *See* § 26–1–126(3), 8 C.R.S. (1997). In effect, then, this funding scheme requires the county itself to match, dollar-for-dollar, any payments made out of the Contingency Fund. *See Colorado Dep't of Soc. Servs.*, 697 P.2d at 21–23. Hence, any shortfall is covered by both other county funds as well as any Contingency Fund advancements.

In *Colorado Department of Social Services*, we examined the legislative history and earlier amendments to our Human Services Code and held that by establishing the Contingency Fund, the General Assembly in-

tended to obligate the state to pay each county for fifty percent of any shortfall.[4] Justice Kirshbaum, writing for a unanimous court, opined that: "By replacing the word 'may' with 'shall,' the General Assembly indicated an intent to make mandatory the advancement of funds to qualifying counties. The references ... to the [State] Department's responsibility for funding eighty percent of public assistance programs subject to funds made available for that purpose, indicates that the contingency fund provision requires additional funding." *Id.* at 22. However, while our interpretation of the plain language of the Contingency Fund Statute in that case was sound, the General Assembly amended that statute.

Finding disfavor with a result that obligated the state to make unlimited appropriations to the Contingency Fund to cover county shortfalls, the General Assembly responded by amending the Human Services Code, enacting House Bill No. 1376 on June 11, 1985 (the Act). *See* 1985 Colo. Sess. Laws, ch. 58 at 289–90. The Act consisted of three principal provisions. The first provision enacted section 2–4–215, 1 C.R.S. (1997). Section 2–4–215 served to clarify the rules of statutory construction by making it clear that legislation passed by one session of the General Assembly cannot bind any future legislative session to appropriate any sums of money.[5] The second provision of

---

**4.** We emphasize that in *Colorado Department of Social Services*, we were not called upon to address, nor did we decide, the issue of standing. Therefore, its precedential value should not be read or assumed to resolve the question of standing, which was then not before us. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984) ("[w]hen questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."); *Indian Oasis–Baboquivari Unified Sch. Dist. No. 40 v. Kirk*, 91 F.3d 1240, 1243–44 (9th Cir.1996), *appeal dismissed on other grounds*, 109 F.3d 634 (9th Cir.1997) ("It is well settled ... that the exercise of jurisdiction in a case is not precedent for the existence of jurisdiction."); *Glidden v. Chromalloy Am. Corp.*, 808 F.2d 621, 625 (7th Cir.1986) ("when a court resolves a case on the merits without discussing its jurisdiction to act, it does not establish a precedent requiring similar treatment of other

cases once the jurisdictional problem has come to light.").

**5.** Section 2–4–215 provides:

(1) The general assembly finds and declares, pursuant to the constitution of the state of Colorado, that each general assembly is a separate entity, and the acts of one general assembly are not binding on future general assemblies. Accordingly, no legislation passed by one general assembly requiring an appropriation shall bind future general assemblies.

(2) Furthermore, the general assembly finds and declares that when a statute provides for the proration of amounts in the event appropriations are insufficient, the general assembly has not committed itself to any particular level of funding, does not create any rights in the ultimate recipients of such funding or in any political subdivision or agency which administers such funds, and clearly intends that the level of funding under such a statute is in the full and complete discretion of the general assembly.

the Act added section 26–1–126.5, 8 C.R.S. (1997), to the Human Services Code. Section 26–1–126.5, in effect, amended the contingency fund statute or section 26–1–126 by emphasizing that the existence of the Contingency Fund does not "result in any state liability for amounts not appropriated" to that fund and by expressly stating that the General Assembly has complete discretion to "determine annually the level of funding" in the Contingency Fund. § 26–1–126.5. Finally, the third provision of the Act added a new subsection, section 26–1–126(5), 8 C.R.S. (1997), to the contingency fund statute. Section 26–1–126(5) provides, in pertinent part:

> If state and county appropriations are insufficient to meet the administrative and program costs of public assistance and the administrative costs of medical assistance and food stamps, then the executive director of the department of social services and the state board of social services shall act pursuant to sections 26–1–121(1)(c) and 26–1–122(5) to reduce the rate of expenditures so that it matches the available funds.

In this fashion, the legislature acted to alter the result that would otherwise follow from our decision in *Colorado Department of Social Services. See* § 26–1–126.5.

### B. Stipulated Facts

The facts of this dispute are based, in substantial part, upon a joint stipulation of facts filed before the trial court. This case involves State fiscal years 1987, 1988, 1989, 1990, and 1991. During those years, the General Assembly did not appropriate sufficient money to the Contingency Fund so as to allow the County to meet its social services obligation or its twenty percent share burden.[6] Accordingly, the County received $1,612,187 less from the Contingency Fund than necessary to meet its social services obligations. Because it received less money

from the Contingency Fund than it expected, the County social services fund showed a deficit for each of the fiscal years in question, amounting to a total of $1,612,187.

The County sought administrative relief from its social services deficits in the form of a reduction in statewide expenditures for social services pursuant to section 26–1–126(5). When state officials refused to voluntarily reduce statewide social services budget expenditures that were legislatively approved and appropriated, the County initiated judicial proceedings against the Department.

### C. Proceedings Below

On May 6, 1991, the County filed a complaint in the Denver District Court. Citing the State Administrative Procedure Act (APA), section 24–4–106(4) and (4.5), the County sought a declaratory judgment that the Department's failure to reduce the rate of statewide social services expenditures was "arbitrary and capricious, [and] a denial of the statutory rights" of the County. In its prayer, the County asked the trial court to issue an order directing the Department "to reduce the rate of statewide social services expenditure" and to "reimburse Pueblo County for its current social services deficit."[7]

On June 6, 1991, the County commenced a second law suit by filing a complaint in the Pueblo County District Court. That complaint named the Department as defendants and asked the Pueblo court to "enjoin" any efforts by defendants to compel the County to pay its social services fund deficit with county funds. In its complaint, the County asserted that sections 26–1–121(1)(c), 26–1–122(5), and 26–1–126(5), 8 C.R.S. (1997), imposed certain duties upon the Department and established statutory legal rights in each county, that is, the power "to reduce the rate of statewide social services expenditure."

---

6. We also note that under the *supplemental* funding scheme of the Contingency Fund, *see* § 26–1–126(3), the state requires the County to match each dollar advanced by the state. Thus, because it must also contribute one-half of the amount of its projected shortfall, the County will suffer a deficit regardless of the amount appropriated by the General Assembly to the Contingency Fund.

7. For purposes of this opinion, all references to the "Department" shall include the Department of Social Services and its successor agency, the Department of Human Services. *See* note 2 *supra.*

Sometime thereafter, the Pueblo County District Court case was transferred to the Denver District Court (trial court) and the two cases were consolidated. No administrative record of the questioned Department action or inaction was ever filed with the trial court.[8] On April 15, 1994, however, the parties submitted a joint stipulation of facts and filed cross-motions for summary judgment.[9]

The trial court granted the Department's motion and dismissed the County's complaint. Relying on *Board of County Commissioners v. Merit System Council*, 662 P.2d 1093, 1094 (Colo.App.1982), the trial court ruled that the County is subordinate to the Department, a "superior state agency," and, therefore, does "not have standing to challenge the actions" of the Department. On April 4, 1995, the trial court entered judgment in favor of the Department.

On appeal, the court of appeals concluded that the County had standing and reversed. *See Board of County Comm'rs v. Romer*, 931 P.2d 504 (Colo.App.1996). The court of appeals noted that the County administers its county services budget and has "*exclusive* authority over all budgetary and financial matters of Pueblo County." *Id.* at 509. The court of appeals found that the County social services fund "experienced a short-fall that adversely affected the general financial well-being of the county." *Id.* at 508. Despite concluding the County is subordinate to the Department, the court of appeals held that "under the facts of this case the [County] has statutory authority to seek judicial review of the Department's actions." The court reasoned that because the Department's actions adversely affected the County's general financial well-being, under APA section 24-4-106(4), 10A C.R.S. (1986), the County has standing because it was adversely affected or aggrieved by agency action. *See id.* at 508-

10. The court of appeals, therefore, held that the County has standing and could compel the Department to comply with its statutory duties under section 26-1-126(5), 8 C.R.S. (1997).

## II. Standing: Constitutional and Prudential Components

■ "The question of standing involves a consideration of whether a plaintiff has asserted a legal basis on which a claim for relief can be predicated." *Board of County Comm'rs v. Bowen/Edwards Assoc.*, 830 P.2d 1045, 1052 (Colo.1992). Standing therefore is that concept of justiciability that is concerned with whether a particular person may raise legal arguments or claims. *See Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968) (no justiciable controversy is presented when there is no standing to maintain the action).

### A. Constitutional Considerations

■ As we have previously held, the constitutional requirements for standing, and hence, exercise of the judicial power of government, are set forth in the two-step test announced in *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). The *Wimberly* test of standing is satisfied if: (1) the plaintiff was injured in fact; and (2) that injury was to a legal right protected by statutory provisions which allegedly have been violated. *See Wimberly*, 194 Colo. at 168, 570 P.2d at 539. The existence of standing necessary to invoke the jurisdiction of our courts depends upon a showing that the action complained of has caused or threatens to cause injury to an interest protected by law. *See Colorado General Assembly v. Lamm*, 700 P.2d 508, 516 (Colo.1985).

**8.** We observe that the County's claims with respect to fiscal years 1987, 1988, 1989, and 1990 may be time barred due to the County's failure to timely file a civil action within thirty days of the agency action or inaction. *See* § 24-4-106(4), 7 C.R.S. (1997); *Buzick v. Public Employees' Retirement Ass'n of Colorado*, 849 P.2d 869, 870 (Colo.App.1992) (complaint for judicial review of decision of administrative review board must be filed within thirty days of final agency action). Here, however, there was no jurisdictional chal-

lenge below. In any event, that is not the case with regard to the County Board's subsection 5 claim pertaining to fiscal year 1991. Hence, for purposes of this proceeding, we assume that the claim was timely filed.

**9.** In its answer to the complaints, the Department asserted a counterclaim against the County. The counterclaim, however, was dismissed at the request and agreement of the parties.

■ The first step, the injury in fact requirement, "is derived from the state constitutional limitation on judicial power requiring the presence of an actual controversy, which is demonstrated by a real injury." *Douglas County Bd. of Comm'rs v. Public Util. Comm'n,* 829 P.2d 1303, 1309 (Colo.1992) (citing Colo. Const. art. VI, § 1; *Maurer,* 779 P.2d at 1323). The second step requires that a plaintiff show that its interest is derived from a recognized legal interest, such as a statute, creating a legally cognizable interest that is concrete and particularized. *See Douglas County,* 829 P.2d at 1309.

## B. Prudential Considerations

■ Our standing inquiry, however, involves both "constitutional and judge-made prudential considerations." *Maurer v. Young Life,* 779 P.2d 1317, 1324 (Colo.1989) (citing *Lamm,* 700 P.2d at 515–16). In addition to the two-part standing test set out in *Wimberly,* prudential considerations follow the "general rule that counties do not have standing to obtain judicial review of a decision of a superior state agency." *Id.* (citing *Lamm v. Barber,* 192 Colo. 511, 519, 565 P.2d 538, 544 (1977)).

■ This judge-made prudential rule exists so that courts do not unnecessarily intrude into matters which are more properly committed to resolution in another branch of government. *See Maurer,* 779 P.2d at 1323 ("[W]e have concluded that absent contrary statutory authority, disputes between a subordinate and a superior state agency are properly to be resolved within the executive branch without resort to judicial review."). This is particularly apparent in a dispute between two executive agencies involving intra-agency relationships. That is, standing does not exist unless, of course, the legislature has exercised its prerogative to grant to the subsidiary agency by "an express statutory right" the ability to sue a superior agency. *See Martin v. District Court,* 191 Colo. 107, 109, 550 P.2d 864, 866 (1976). The rule of *Martin,* in essence, represents our considered judgment of twenty years, as evinced in our precedent, *see Martin,* 191 Colo. at 109, 550 P.2d at 866; *Barber,* 192 Colo. at 519, 565 P.2d at 544; *Maurer,* 779 P.2d at 1323;

*Douglas County,* 829 P.2d at 1309–10, that we leave to the General Assembly the answer to the question that controls our deliberations today: whether we acknowledge the right to judicial review as an attribute of any subordinate agency. Thus, without a plain and unmistakable expression of such intent by the legislature, the judiciary will not expand the rights of a subordinate agency to include the right to obtain judicial review of the actions of a superior agency. In other words, without an express statutory right to secure judicial intervention, we assume that any intra-agency dispute is better saved for determination through the political, and not judicial, process.

In that regard, we find wisdom in our precedent and practice that defers to the political process the protection of an alleged right or interest that may not be properly determined here but left to our sister branches of government. Hence, until the General Assembly speaks otherwise, the intra-agency dispute is not one suitable for resolution by the courts and, prudently, is not justiciable. We recognize in our judge-made rule, of course, that where the General Assembly expressly provides that a subordinate agency may seek judicial review of the actions of a superior state agency, standing does exist. This is so where a statute explicitly confers a right upon a subordinate agency to seek judicial review of the superior agency decision. *See Maurer,* 779 P.2d at 1323; *Martin,* 191 Colo. at 109, 550 P.2d at 866. In *Maurer,* we highlighted that both tests apply to the standing analysis where a subordinate agency sues the state:

> The rule of *Martin* is a specialized one that operates to *preclude* standing in certain instances where we have concluded that absent contrary statutory authority, disputes between a subordinate and a superior state agency are properly to be resolved within the executive branch without resort to judicial review. However, in order to *establish* standing, a plaintiff must still demonstrate that she satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

*Maurer,* 779 P.2d at 1323. Therefore, in a case like the one before us, involving a subordinate agency seeking review of the action of a superior agency, we apply both tests for standing: the two-part inquiry as enunciated in *Wimberly,* and the rule of *Martin.*

### III. Applying the Rule of *Martin*

In bringing the present claim, the County relies primarily on section 26–1–126(5) and section 24–4–106(4) of the APA. In addition, the court of appeals relied upon the county's general statutory attribute of "exclusive authority" over all its budgetary and financial matters, *see Romer,* 931 P.2d at 509, but did not offer any language of express grant to support its result. As explained further below, these statutes simply do not evince an express legislative grant to the County of a right to seek review of adverse Department decisions.

#### A. Section 26–1–126(5)

█ The Department seeks reversal of the court of appeals' judgment upholding the county's standing to seek judicial review asserting that, as a subordinate agency, the county is without power to obtain judicial review. We agree.

In *Martin,* 191 Colo. at 109, 550 P.2d at 866, we held that *"[i]n the absence of an express statutory right,* a subordinate state agency (the county board) lacks standing or any other legal authority to obtain judicial review of an action of a superior state agency." *Id.* (emphasis added). We have continued to follow this standing test for subordinate agencies in our subsequent cases. *See, e.g., Douglas County,* 829 P.2d at 1309–10; *Maurer,* 779 P.2d at 1320–23; *City and County of Denver v. Brockhurst Boys Ranch, Inc.,* 195 Colo. 22, 27, 575 P.2d 843, 846 (1978).

##### 1. The County is a "subordinate agency"

In the present case, the County was acting as a subordinate state agency. The Colorado Human Services Code, §§ 26–1–101 to –201, 8 C.R.S. (1997), is unmistakably clear in pointing out that a county board is an agent of the state when it makes expenditures for social services. Section 26–1–118(1), 8 C.R.S.

(1997), states in relevant part: "The count[ies] ... *shall serve as agents of the state department* and shall be charged with the administration of public assistance and welfare and related activities in the respective counties *in accordance with the rules and regulations of the state department."* (Emphasis added.)

In support of this view that counties are, with respect to actions related to their social services budgets, subordinate agents of the state, we note that a county may not adopt a social services budget until it has been submitted to the state for review, *see* § 26–1–124, and the county social services fund must be administered in accordance with state rules, *see* § 26–1–123. Indeed, in the extreme case where a county has failed to comply with state rules regarding social services, the state may terminate all financial assistance to the county and directly administer the social services programs of the county. *See* § 26–1–109(4)(b), (c), 8 C.R.S. (1997). Moreover, our cases have consistently held that a county board, when acting in its capacity as the county board of social services, is a subordinate agency of the Department. *See Brockhurst Boys Ranch,* 195 Colo. at 27, 575 P.2d at 846; *Martin,* 191 Colo. at 109, 550 P.2d at 865; *Board of County Comm'rs v. State Bd. of Soc. Servs.,* 186 Colo. 435, 442, 528 P.2d 244, 247–48 (1974). We recently reiterated that result in *Romer v. Board of County Commissioners for County of Weld,* 897 P.2d 779 (Colo.1995) (county social services program functions as agent of state) and *State v. Board of County Commissioners of Mesa County,* 897 P.2d 788 (Colo.1995) (same). Here, because the County was both making expenditures for social services and was acting in its capacity as the county board of social services, the County was a subordinate agency to the Department.

##### 2. The absence of express authority

█ As a subordinate agency of the state, the County may seek judicial review of the Department's action only if the General Assembly so provided by express statutory authorization. *See Maurer,* 779 P.2d at 1320; *Martin,* 191 Colo. at 109, 550 P.2d at 866. Upon examining the relevant statute, *see*

§ 26–1–126(5), 8 C.R.S. (1997), we conclude that the General Assembly has not granted express authority to the County to sue the Department. Section 26–1–126(5) provides:

Each county eligible for county contingency funds pursuant to this section shall only be responsible for an amount equal to the county's pro rata share of the general assembly's appropriation to the county contingency fund. If state and county appropriations are insufficient to meet the administrative and program costs of public assistance and the administrative costs of medical assistance and food stamps, then the executive director of the department of human services, the executive director of the department of health care policy and financing, and the state board of human services shall act pursuant to sections 26–1–121(1)(c) and 26–1–122(5) to reduce the rate of expenditure so that it matches the available funds.[10]

Nowhere in the statute is it evident that the legislature has *expressly* conferred on counties, or any other subordinate state agency, standing to sue the Department.

In further support, we contrast the present case with *Maurer*, 779 P.2d at 1317. In that case, we assumed that the Property Tax Administrator of the State of Colorado (the Administrator) was a subordinate state agency to the Board of Assessment Appeals (the Board), and concluded that the relevant statute in that case authorized the Administrator to sue the Board. *See id.* at 1321. Unlike section 26–1–126(5), however, the statute at issue in *Maurer* explicitly allowed the respondent to seek judicial review of the Board's decisions. Section 39–2–117(6), 16B C.R.S. (1988 Supp.), provided:

If the decision of the board is against the respondent, the respondent, upon the recommendation of the board that it is a matter of statewide concern and within thirty days after such decision, *may petition the district court* of the county in which the property is located for judicial review pursuant to section 24–4–106, [10A] C.R.S. [1988].

*Maurer*, 779 P.2d at 1321 (emphasis added). After we concluded that the Administrator was a proper respondent, we logically held that the statute expressly allowed the Administrator to seek judicial review in "the district court" of the Board's decision. *See id.* at 1322–23.

In contrast with the statute at issue in *Maurer*, however, here, section 26–1–126(5) is strikingly different. Section 26–1–126(5) authorizes the executive director and state board to "reduce the rate of expenditures so that it matches the available funds" when "state and county appropriations are insufficient" to meet social services program costs. Unlike section 39–2–117(6), in *Maurer*, which stated that the respondent agency "may petition the district court," section 26–1–126(5)

---

**10.** Section 26–1–122(5), 8 C.R.S. (1997), provides:

(5) If in any fiscal year the annual appropriation by the general assembly for the state's share, together with any available federal funds for any income maintenance or social services program, or the administration of either, is not sufficient to advance to the counties the full eighty percent share of costs, said program or the administration thereof shall be temporarily reduced by the state board, so that all available state and federal funds shall continue to constitute eighty percent of the costs.

Section 26–1–121(1)(c), 8 C.R.S. (1997), provides:

(c) When the executive director determines that adequate appropriations for the payment of the costs described in paragraph (a) of this subsection (1) have not been made and that an overexpenditure of an appropriation will occur based upon the state department's estimates, the state board may take actions consistent with state and federal law to bring the rate of

expenditure into line with available funds. The general assembly declares that case load and utilization based on medical necessity are legitimate reasons for supplemental funding.

Section 26–1–121(1)(a), 8 C.R.S. (1997), provides:

(1)(a) For carrying out the duties and obligations of the state department and county departments under the provisions of this title and for matching such federal funds as may be available for public assistance and welfare activities in the state, including but not limited to assistance payments, food stamps (except the value of food stamp coupons), social services, medical assistance, child welfare services, rehabilitation, programs for the aging and for veterans, and related activities, the general assembly, in accordance with the constitution and laws of the state of Colorado, shall make adequate appropriations for the payment of such costs pursuant to the budget prepared by the executive director.

does not even mention judicial review, nor does it address any recourse in the event the Department does not act accordingly. Succinctly, subsection (5) simply does not provide the county with a right to seek judicial review in district court. *Cf. Maurer*, 779 P.2d at 1321. This is not an error of omission, but a statement of legislative intent. The General Assembly has created such a right elsewhere in our Human Services Code and did so by the use of unmistakable language. *See* § 26–1–120 (providing *"[a] county board shall have the right to obtain judicial review* of a decision of the merit system council concerning the county directly in accordance with section 24–4–106, C.R.S.1973")  (emphasis added); *see also Douglas County* 829 P.2d at 1308 (statute at issue provided that "each party to the action or proceeding before the commission shall have the right to appear in the review proceedings") (emphasis added). We find no such language in section 26–1–126(5).

We therefore conclude that, under *Martin* and related case law, section 26–1–126(5) does not expressly grant a right to file suit. The County's reliance on subsection 5 for standing to seek judicial review of the Department's decision is misplaced.

### B. Section 24–4–106(4) of the APA

█ The County also contends that section 24–4–106(4) of the APA provides standing to compel the Department to reduce the statewide rate of social services expenditures. Section 24–4–106(4) provides that:

[A]ny person adversely affected or aggrieved by any agency action *may commence an action* for judicial review in the district court within thirty days after such agency action becomes effective; but, if such agency action occurs in relation to any hearing pursuant to section 24–4–105 [adjudicatory determinations], then the person must also have been a party to such agency hearing. A proceeding for such review may be brought against the agency by its official title, individuals who comprise the agency, or any person representing the agency or acting on its behalf in the matter sought to be reviewed. *The complaint shall state the facts upon which the plaintiff bases the claim that he has been adversely affected or aggrieved, the reasons entitling him to relief and the relief which he seeks.* . . . Each agency conducting a rule-making proceeding shall maintain a docket listing the name, address, and telephone number of every person who has participated in a rule-making proceeding by written statement, or by oral comment at a hearing. Any person who commences suit for judicial review of the rule shall notify each person on the agency's docket of the fact that a suit has been commenced. The notice shall be sent by first-class certified mail within ten days after filing of the action and shall be accompanied by a copy of the complaint for judicial review bearing the action number of the case. Thereafter, service of process, responsive pleadings, and other matters of procedure shall be controlled by the Colorado rules of civil procedure.

(Emphasis added.) Section 24–4–106(4), however, like subsection 5 above, does not evince a legislative grant to the County of a legal right to seek judicial review of State Department decisions.

█ Initially, we observe that the APA does not create substantive legal rights on which a claim for relief can be based. That is, such substantive legal rights must exist either by statutory language, by the agency's rules and regulations, or by some constitutional command. Our interpretation of our APA is consistent with that of the United States Supreme Court in *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977), which concluded that the federal APA did not confer substantive jurisdiction: "We thus conclude that the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action." *See also Alabama Cellular Serv., Inc. v. Sizemore*, 565 So.2d 199, 202 (Ala.1990) (quoting Alabama APA section 41–22–2(e): "This chapter is not meant to alter the substantive rights of any person or agency. Its impact is limited to procedural rights with the expectation that better substantive results will be achieved in the everyday conduct of state government by improving the process by which those results

are attained."); *Rowell v. State,* 229 Ga.App. 397, 494 S.E.2d 5, 6 (1997) ("In enacting the APA, the legislature specifically provided that the APA did not 'create any substantive rights' and denoted its requirements as procedural"); *West Virginia Bd. of Educ. v. Perry,* 189 W.Va. 662, 434 S.E.2d 22, 25 (1993) (APA does not create substantive rights, as such rights must exist either by statutory language creating agency hearing, by agency's rules & regulations or by some constitutional command); Frank E. Cooper, *State Administrative Law* 536 (1965) (Revised Model State Act "has in effect been construed to open the doors to judicial review only in cases where some other statute confers a right to appeal."); *see generally* C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3568 (1975) (rejecting APA jurisdiction).

Section 24–4–106(4) of the APA, therefore, does not create a legally protected right so as to confer upon the County standing to seek judicial review. Rather, section 24–4–106(4) simply addresses the procedures of review available once it is properly established that the dispute is justiciable pursuant to some other statutory grant.

■ Additionally, the County contends that because the APA defines a "person" who may seek judicial review to include counties, § 24–4–102(12), 7 C.R.S. (1997), this legislative enactment grants a county a substantive right to bring an action under the APA. We disagree.

*Board of County Commissioners of Dolores County v. Love,* 172 Colo. 121, 470 P.2d 861 (1970), is illustrative. There, a county sought review of actions by the State Board of Equalization and the Tax Commission. The county argued it had standing because of its statutory authority to sue and be sued. We rejected this argument and explained:

> The right "to sue" relates to the county's function as a body corporate and can only be exercised within the framework of the specific powers granted counties and boards of county commissioners. *Such does not grant a general power to sue in any and all situations.*

*Id.* at 126, 470 P.2d at 863 (citations omitted) (emphasis added). Here, similarly, we conclude that the provision of the APA that includes counties within the definition of "person" was not intended to confer substantive rights upon counties to sue the State.

We are cognizant of our decision in *Douglas County Board of Commissioners v. Public Utilities Commission,* 829 P.2d 1303 (Colo.1992). That case, however, is distinguishable. There, the Public Utilities Commission of the State of Colorado (PUC) granted the Public Service Company of Colorado's (PSCo) application to upgrade an electric transmission line that runs through Douglas County. PSCo's request was made pursuant to the public utilities exception statute, *see* § 30–28–127, 12A C.R.S. (1986), which authorizes the PUC to order improvements to public utility equipment (including power lines), although the improvement derogates from a county's adopted land use plan:

> After the adoption of a plan, all extensions, betterments, or additions to buildings, structures, or plant or other equipment of any public utility shall only be made in conformity with such plan unless, after public hearing first had, the public utilities commission orders that such extensions, betterments, or additions to buildings, structures, or plant or other equipment are reasonable and that extensions, betterments, or additions may be made even though they conflict with the adopted plan.

§ 30–28–127, 12A C.R.S. (1986). In granting PSCo's application, the PUC found that the deviation from the county land use plan reasonable:

> The PUC also found that the factors considered in phase two of the hearing—land use, noise, property values, and aesthetics—did not adversely affect the overall reasonableness of the transmission line upgrade. Addressing phase three, the health impacts of the upgrade, the PUC concluded that, as of the time of the decision, "no known or apparent adverse health effects existed resulting from electric and magnetic fields from low level overhead power transmission lines," and, therefore, these considerations did not justify disapproval of the reasonable request to upgrade the

line. Finally, again citing the policy of prudent avoidance, the Commission engaged in balancing the costs of burying the power line against the benefits of burial and concluded that burial was not warranted.

*Douglas County Bd. of Comm'rs*, 829 P.2d at 1306.

On appeal, the district court determined, among other things, that the Douglas County Board of Commissioners (Douglas County) had standing to request judicial review of the action of the PUC. *Id.* at 1304. On certiorari to this Court, we upheld the district court's decision on standing, reasoning that *"section 40–6–115(1), when read in conjunction with section 24–4–106(4), confers statutory authority for the county to seek review." Id.* at 1310 (emphasis added). Section 24–4–106(4) is the identical APA provision under which the County brought the present action. Section 40–6–115(1) provides, in pertinent part, that "[t]he [public utilities] commission and each party to the action or proceeding before the commission shall have the *right to appear* in the review proceedings." (Emphasis added.) We therefore interpreted section 40–6–115(1), when read together with section 24–4–106(4), to evince a legislative intent to allow parties who appeared at the PUC proceeding to initiate an appeal. *Id.* at 1308.

In contrast, here, we are aware of no identifiable statutory provision that evinces a legislative intent to provide a county that has not raised its 20% share of social services funding to judicially compel the Department to lower statewide expenditures. Section 26–1–126(5) does refer to a duty. However, as previously explained, subsection 5 fails the *Martin* standing test because it does not provide by express statutory authorization that the County may seek judicial review of the Department's action or inaction. While the statute at issue in *Douglas County Bd. of Comm'rs*, 829 P.2d at 1306, expressly authorized "the right to appear in the review proceedings," subsection 5 contains no such express authorization. Therefore, the County does not have standing to sue the Department even when reading sections 26–1–126(5) and 24–4–106(4) together.

We note that the consequence of the court of appeals' holding is at odds with our earlier decisions delimiting a subordinate state agency's power to challenge the decisions of the superior state entity. Under the court of appeals' holding, anytime a statute imposes a duty on a state agency and that duty, when properly carried out, creates a benefit for a subordinate state agency, the subordinate state agency would have standing to sue the state. Thus, whenever the subordinate state agency decides that it is not receiving the benefit to which it is entitled, the subordinate state agency can summon the superior state agency into court. Such a result is contrary to our earlier case law and judge-made prudential consideration which narrowly circumscribed the situations in which a subordinate state agency could challenge state action in state court. Moreover, the court of appeals' opinion opens the door for the judiciary to become the arbiter of disputes between superior and subordinate executive agencies. Our prior cases properly recognized that the judiciary should review intra-executive disputes only when the legislature specifically placed the judiciary in that position. Consequently, we should continue to follow the policy that, unless the legislature specifically provides otherwise, the proper forum for intra-executive dispute resolution is the executive branch itself.

### C. The Purposes & Context Nullify Damages Claims

Finally, we observe that it is doubtful that the General Assembly intended that a section 26–1–126(5) damages claim would be enforced by a county. The legislative context of its adoption leads us to conclude that neither section 26–1–126(5), nor section 24–4–106(4) explicitly confers a substantive legal right on the County to sue for monetary damages to cover its $1,612,187 deficit. A fair reading of the plain language of the Act under which subsection 5 was adopted militates against any such conclusion for at least two reasons. First, in section 26–1–126.5, the General Assembly made it patently clear that it had full discretion not to appropriate funds for the Contingency Fund and that such exercise of legislative prerogative did not create "any state liability for amounts not

appropriated" by the State. *See* § 26–1–126.5. Second, section 2–4–215, instructs that legislation passed by one session of the General Assembly cannot bind any future legislative session to appropriate any sums of money. The essence of that Act was to allow the state to avoid any financial obligations or "liability" to the counties, a result contrary to that sought by the County.

██ Moreover, any reading of the statute to require monetary damages would lead to an absurd result in light of section 26–1–126.5 and section 2–4–215. *See Board of County Comm'rs v. IBM Credit Corp.*, 888 P.2d 250, 252 (Colo.1995) (statutes should be construed to avoid rather than to enhance absurd consequences). It would be absurd to read into the Contingency Fund statute a county right to compel an appropriation of funds by the General Assembly in the name of a money damages award. To do so would render a complete nullity of the General Assembly's explicit language in section 26–1–126.5 that it "specifically rejects ... any implication ... [that] would result in any state liability" and that it has complete discretion to determine the level of funding in the Contingency Fund. Such a reading would be contrary to the legislative intent that pursuant to section 2–4–215, subsequent sessions of the General Assembly are not compelled to make appropriations based on legislation passed by previous sessions. *See IBM Credit Corp.*, 888 P.2d at 252. Accordingly, we reject the County's claim for monetary damages as contrary to the General Assembly's most clearly stated public policy when it adopted section 26–1–126(5) under the Act. *See McClellan v. Meyer*, 900 P.2d 24, 30 (Colo.1995) ("It is presumed that the General Assembly intends a just and reasonable result when it enacts a statute, and a construction which leads to an absurd result will not be followed.").

Consequently, in reliance upon the same plain language, the County is without standing to hold the Department liable and to obtain monetary damages to cover its $1,612,187 deficit. Any deficits actually incurred, therefore, may best be characterized as *damnum absque injuria*, a wrong for which the law affords no remedy.

## IV. Conclusion

In sum, we conclude that the County is a subordinate agency of the Department. We further conclude that under the rule of *Martin*, the General Assembly did not confer to the county explicit authority to seek judicial review of the Department's action under any reading of section 26–1–126(5) and section 24–4–106(4). We therefore reverse the judgment of the court of appeals and hold that the County is without standing to compel a reduction in duly authorized statewide expenditures. Accordingly, this matter is remanded to the court of appeals with directions that it reinstate the judgment of the Denver District Court dismissing the County's case and ruling in favor of the defendants.

KOURLIS and MARTINEZ, JJ., dissent.

VOLLACK, C.J., does not participate.

Justice KOURLIS dissenting:

Because I believe that the Board of County Commissioners of Pueblo County (BOCC) is acting here under its express and distinct statutory authority to manage and budget the affairs of Pueblo County, and not in its role as agent for the State Department of Social Services, I conclude that the County has standing to sue in this case and I therefore respectfully dissent.

## I.

Any analysis of this area of the law rightfully begins with the general proposition that a subordinate county agency has no standing or legal authority to question or obtain judicial review of an action taken by a superior state agency. *See Lamm v. Barber*, 192 Colo. 511, 519, 565 P.2d 538, 544 (1977). In *Lamm*, this court stated that a subordinate county official "had no more standing to question the validity of the action of the Board [of Assessment Appeals] than a lower court has to question the validity of the mandate of the reviewing court. [The official] was obligated to carry out the mandate of the Board. There is no legal justification for his defiance...." *Id.* at 520, 565 P.2d at 544 (quoting *People ex rel. State Bd. of*

*Equalization v. Hively,* 139 Colo. 49, 74, 336 P.2d 721, 735 (1959)).

That concept has its roots in the general notion that a subordinate agency may not challenge the principal's policies by way of court process. Similarly, the United States Supreme Court has held that policy matters between or inside governmental agencies should not be resolved by the courts. *See Director, Office of Workers' Compensation Programs v. Newport News Shipbuilding and Dry Dock Co.,* 514 U.S. 122, 127, 115 S.Ct. 1278, 1284, 131 L.Ed.2d 160 (1995).

Boards of county commissioners serve a variety of functions, and are certainly not limited to acting as subordinate agencies. One discrete function involves the duties prescribed under the Human Services Code, to wit: "the county departments or other state designated agencies, where applicable, shall serve as agents of the state department and shall be charged with the administration of public assistance and welfare and related activities in the respective counties in accordance with the rules and regulations of the state department." § 16–1–118(1), 6 C.R.S. (1997). However, and much more broadly, boards of county commissioners have the authority to levy taxes, make assessments, and operate county government. *See* § 30–11–107, 9 C.R.S. (1997). Although the authority delegated to county commissioners stems from the state, *see Board of County Comm'rs of Douglas County, Colo. v. Bainbridge, Inc.,* 929 P.2d 691, 699 (Colo.1996), such boards cannot be said to be acting as agents of the state for all purposes. Indeed, the General Assembly has directed that "[t]he County shall perform its public assistance and welfare duties, responsibilities, and activities separate and apart from the duties and responsibilities of the Board of County Commissioners." § 26–1–116(3), 8 C.R.S. (1997).

Hence, in my view the appropriate inquiry in this case is whether the BOCC was, indeed, acting in its agency capacity in the context of this lawsuit. I conclude that it was not.

A.

The BOCC was acting in its capacity as a spending and taxing authority, not in its capacity as agent for the State Department of Social Services, when it brought this action.[1] It was attempting to protect its taxpayers from an increase in property tax rates that could be occasioned by a deficit. This activity falls within the broad powers granted to boards of county commissioners set forth in section 30–11–107, not within the discrete subordinate functions found in section 16–1–118(1).

In *Board of County Commissioners of Jefferson County v. Merit System Council,* 662 P.2d 1093 (Colo.App.1982), the court of appeals addressed a circumstance in which a board of county commissioners sought judicial review of an order entered by the Merit System Council reinstating a terminated employee. The court of appeals held that "the standing of the Board of County Commissioners depends upon the standing of the County Board and the County Department of Social Services to maintain an action for judicial review. We conclude that neither ... has standing to seek judicial review under the circumstances here." *Id.* at 1094. Certainly it is good law that the County Board of Social Services and the County Department of Social Services do not have standing to sue the State Department of Social Services. The former are the agents of the latter, and are empowered to act upon the State policies—not to challenge them.

A basic principle of the law of standing is that a representative entity has standing to seek relief only if the party on whose behalf that entity is acting would also have standing in its own right. *See Denver Classroom Teachers Ass'n v. Denver Sch. Dist. No. 1,* 738 P.2d 414, 415 (Colo.App.1987) (finding standing where members of the association would have standing to sue in their own right under facts alleged). Thus, if the Board of County Commissioners is acting in lieu of the County Department of Social Services or

---

1. Prior to the trial court's ruling on cross-motions for summary judgment, the parties entered a stipulation of facts. As part of the stipulation, the parties agreed that the BOCC was bringing

this action in its capacity as the Board of County Commissioners of Pueblo County. *See Board of County Comm'rs of County of Pueblo v. Romer,* 931 P.2d 504, 506 (Colo.App.1996).

County Board of Social Services, it would not have standing. The court of appeals' holding in *Merit System Council* falls within this general precept.

However, I find a critical distinction in the case currently at issue. Here, the BOCC is not acting as the Board of Social Services challenging an internal policy decision; rather the BOCC is acting as a separate and distinct entity whose budgetary responsibilities are directly and disproportionately impacted by the subject matter of the lawsuit. The authority to levy and assess taxes and manage the whole county budget cannot come from the Colorado Board of Human Services because that board has no such power and an agent can have no greater power than its principal. *See* Restatement (Second) of Agency § 12 cmt. a (1958). Rather, the BOCC's powers in this context derive directly from the Colorado Constitution, Article XIV and from sections 30-11-101 and -107, 9 C.R.S. (1997). The BOCC here is seeking to vindicate its duty to manage the county budget, which duty is not undertaken as an agent of the Board of Human Services, but rather as an independent governmental body.

### B.

I turn then to the Administrative Procedures Act (APA), because the action sought to be redressed is an agency action. Section 24-4-106(4) of the APA provides that: "Any person adversely affected or aggrieved by any agency action may commence an action for judicial review in the district court within thirty days after such agency action becomes effective...." § 24-4-106(4) 7 C.R.S. (1997).

The General Assembly has defined a county as a "person" and not as an "agency" for purposes of the APA. *See* §§ 24-4-102(12); 24-4-102(3), 7 C.R.S. (1997). *See also Douglas County Bd. of Comm'rs v. Public Utils. Comm'n,* 829 P.2d 1303 (Colo.1992). Hence, there is a basis for asserting standing by the BOCC under the Act.[2]

The next inquiry then, is whether the BOCC is adversely affected or an aggrieved party within the meaning of section 24-4-106 of the APA. This analysis parallels the general inquiry under the law of standing: whether the party has been injured in fact and whether the injury is to a legally protected right. *See Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

The county's injury in fact is clearly the $1,612,187 deficit alleged in the pleadings. Whether the injury is protected at law is less clear, but in my view the question should be answered in the affirmative at this stage of the proceedings.

Determining whether the asserted injury is one protected by law comes perilously close to deciding the merits of the lawsuit rather than the right of the county to maintain the lawsuit. This case is before us at the starting gate, and we are called upon to determine whether the parties may run the race—not who will win. The case was dismissed by the trial court on summary judgment. Pursuant to the standards applicable to a summary judgment motion, all doubts legitimately raised by any evidence or pleadings before the court must be resolved against the moving party. *See Smith v. Boyett,* 908 P.2d 508, 514 (Colo.1995).

The BOCC seeks injunctive and declaratory relief under the terms of sections 26-1-121(1)(c), -122(5) and -126(5). Subsection -126(5) contains the provisions regarding the reduction of expenditures to match available funding. The subsection was a part of House Bill No. 1376, enacted on June 11, 1985. *See* ch. 58, sec. 2, § 26-1-126(5), 1985 Colo. Sess. Laws 289, 290. House Bill 1376 was drafted in reaction to this court's decision in *Colorado Department of Social Services v. Board of County Commissioners,* 697 P.2d 1 (Colo. 1985), holding that the General Assembly was required to fund the Contingency Fund in a sufficient amount to fulfill the justifiable claims of counties eligible for such assistance.

---

2. Because I conclude that the BOCC was acting in its capacity as spending and taxing authority, rather than its capacity as a subordinate agent for the State Department of Social Services, the

express statutory right requirement set forth in *Maurer v. Young Life,* 779 P.2d 1317, 1320 (Colo. 1989), is inapposite.

Soon after our decision in *Colorado Department of Social Services*, the General Assembly noted its disagreement with the court's conclusion by enacting legislation which provides that: (1) legislation passed by one session of the General Assembly cannot bind future legislative sessions to appropriate any sums of money, *see* § 2–4–215, 1 C.R.S. (1997); (2) the General Assembly has absolute discretion to "determine annually the level of funding" in the Contingency Fund, and the existence of the Contingency Fund does not "result in any state liability for amounts not appropriated" to that fund, *see* § 26–1–126.5, 8 C.R.S. (1997); and (3) the appropriate response to a shortage of funds in the Contingency Fund is a reduction in the rate of state social services expenditures to be implemented by the executive director of the department. *See* § 26–1–126(5).

House Bill 1376, as enacted, satisfies the requirement that the harm suffered be to a legally protected interest. The County's interests are specifically protected by the language of the statute, and the statute was designed to address the very injury that has occurred. *See Maurer v. Young Life*, 779 P.2d 1317 (Colo.1989).[3]

## II.

I would thus affirm the court of appeals' conclusion that the BOCC has met the requirements necessary to maintain an action in court and would affirm the judgment of the court of appeals.

Justice MARTINEZ dissenting:

As a subordinate arm of the state, the County must satisfy three requirements in order to seek judicial review of an action of a state agency. First, the County must point to a statutory provision conferring a right upon the County to seek this review. *See Maurer v. Young Life*, 779 P.2d 1317, 1320 (Colo.1989); *Martin v. District Court*, 191 Colo. 107, 109, 550 P.2d 864, 866 (1976) (the "*Martin* test"). Next, the County must sat-

isfy the two-part standing inquiry described in *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). Under the *Wimberly* test, a court must determine "(1) whether the plaintiff was injured in fact, [and] (2) whether the injury was to a legally protected right." *Id.*, 570 P.2d at 539. In my view, the County has fulfilled these requirements, and therefore may seek review of the Department's actions in this case.

## I.

## A.

Generally speaking, "counties do not have standing to obtain judicial review of a decision of a superior state agency." *Douglas County v. Public Utilities Comm'n*, 829 P.2d 1303, 1309 (Colo.1992). This general rule does not apply, however, where the legislature has granted the county the right to seek such review. *See Maurer*, 779 P.2d at 1320. Thus, even where a "judge-made prudential rule" suggests a different public policy regarding inter-agency disputes, maj. op. at 573, we must defer to the legislature's expression of public policy and intent to grant standing to a subordinate agency such as a county. This legislative grant need not take any particular form or use any particular language. It is sufficient that relevant statutory provisions evidence a legislative intent to allow the county to appeal the decision of the state agency.

For example, in *Douglas County*, we held that the legislature conferred a right upon the county to seek judicial review of a decision by the Public Utilities Commission (the "PUC"). We applied the *Martin* test in that case because we assumed, without deciding, that the county was subordinate to the PUC. *See Douglas County*, 829 P.2d at 1308–10. We recognized the county's standing to appeal in that case because the General Assembly had granted the county the right to seek judicial review in satisfaction of the *Martin* test (which test is applicable to subordinate

**3.** The BOCC also has asserted a claim for money damages associated with the failure of the State Director to undertake the subsection (5) adjustment. Availability of money damages as a remedy under the APA is arguable. Because I would

permit standing to pursue the requests for injunctive and declaratory relief, and because the issue is not formally presented at this early stage, I would not reach the question of whether damages may be available.

agencies seeking judicial review). *See id.* This conclusion made it unnecessary to decide whether the county was actually subordinate to the PUC, and thus we made no finding on this issue.

In applying the *Martin* test in *Douglas County*, we held that the county had standing despite the fact that no single statutory provision expressly granted this right to the county. Section 40–6–115(1) of the Public Utilities Law provided that the PUC and "each party to the action or proceeding before the [PUC] shall have the right to appear in the review proceedings." *See* §§ 40–1–101 to 40–7–111, 17 C.R.S. (1984). Additionally, section 24–4–106(4) of the State Administrative Procedure Act (the "APA") provided that "any person adversely affected or aggrieved by any agency action may commence an action for judicial review" of the agency's decision. *See* §§ 24–4–101 to –108, 10A C.R.S. (1988).

In answering the standing inquiry, we reasoned that section 24–4–106(4), when "[r]ead together with section 40–6–115(1)," evinced a legislative intent to allow the county, as a party to the PUC proceeding, to initiate an appeal of the PUC's actions. *Douglas County*, 829 P.2d at 1308. Implicit in our holding was a finding that neither statute, standing alone, expressly conferred a right upon the county to seek judicial review. Rather, a comprehensive reading and interpretation of the relevant statutes lead to our conclusion that the General Assembly intended to grant the county standing to challenge a decision of the superior state agency.

The circumstances of the instant case charge this court with a similar task of statutory construction. No single statutory provision expressly confers upon the County the right to seek judicial review of the Department's acts, or failures to act, in this case. As discussed above, however, our inquiry does not end with this fact. Instead, we must investigate those statutory provisions that relate specifically to (1) the Department's duties as alleged by the County and (2) the County's recourse in the event the Department fails to fulfill these duties. If, when read together, these statutory provisions evidence a legislative intent to allow the

County to seek review of the Department's decisions in this case, the first requirement of the standing inquiry is satisfied.

The County alleges that section 26–1–126(5) of the Colorado Human Services Code imposes a duty upon the Department to reduce the statewide rate of expenditures whenever necessary to avoid or reduce deficits in county social services budgets. *See* §§ 26–1–101 to –201, 8 C.R.S. (1997). Section 26–1–126(5) ("Subsection 5") outlines procedures for administering the state-funded Contingency Fund. The Contingency Fund was established to assist counties having difficulties meeting their funding obligations with respect to certain social services programs. Where the Contingency Fund does not contain sufficient funds to provide this relief to counties, Subsection 5 prescribes a course of action. Subsection 5 provides, in part:

> If state and county appropriations are insufficient to meet the administrative and program costs of public assistance and the administrative costs of medical assistance and food stamps, then *the executive director of the department of social services and the state board of social services shall act pursuant to sections 26–1–121(1)(c) and 26–1–122(5) to reduce the rate of expenditures so that it matches the available funds.*

§ 26–1–126(5) (emphasis added).

Because the language of Subsection 5 is mandatory, I agree with the County's contention. Subsection 5 imposes a duty upon the Department to cause social services expenditures to match available funds. The performance of this duty protects the County from incurring potential deficits not covered by the Contingency Fund. After receiving notice of the reduced rate of social services expenditures, the County may adjust its spending to match its funding. By failing to reduce state expenditures to match the funds available in the Contingency Fund, the Department creates the possibility that the County's expenditures may exceed its funding.

Therefore, because the interest to be protected by Subsection 5 is that of the County, the duty prescribed by Subsection 5 is one

owed the County. This fact alone, however, does not confer upon the County the right to seek judicial review. Rather, it delineates the County's substantive interest in the Department's performance of its duties under Subsection 5. When read in conjunction with Section 24–4–106(4) of the APA, however, Subsection 5 does provide a statutory basis upon which a County may seek judicial review of the Department's decisions.

Section 24–4–106(4) describes the procedures available to parties who have been aggrieved by the actions of an agency. *See* § 24–4–106(4). As noted above, this section affords any "person adversely affected or aggrieved" by an agency's decision the right to obtain judicial review of that decision. *Id.* The APA includes a county within its definition of a "person" entitled to seek judicial review. *See* § 24–4–102(12), 7 C.R.S. (1997). According to the County's allegations, it has been adversely affected by the Department's failure to perform its obligations under Subsection 5. Consequently, Subsection 5 provides a substantive legal right pursuant to which the County may seek relief when accompanied by the procedural aspects of agency review in section 24–4–106(4).

This analysis parallels our decision in *Douglas County. See* 829 P.2d at 1310. In neither case did the General Assembly explicitly grant the county the right to appeal the superior agency's decision. In *Douglas County*, we did not find that the language of section 40–6–115(1), by itself, granted the county the right to appeal the PUC's decision. Rather, it was the interplay between this section and the APA which proved critical and which demonstrated the General Assembly's intent to allow the county to appeal. Similarly, in this case, the legislative intent to allow the County to seek judicial review is apparent in the interplay between the APA and Subsection 5.

The fact that the General Assembly intended to allow the County to compel the Department to perform its duties under Subsection 5 is illustrated by the legislative history of this legislation. During a discussion of the impact of Subsection 5, Senator Fowler noted that, when it becomes apparent that the Contingency Fund is insufficient to pro-

vide full relief to the counties from their budgetary shortfalls, the counties may "make application to the executive director of the department of social services ... and the executive director and the board of social services *shall reduce* overall funding from all the programs in the State of Colorado." *See* Senate Journal, 55th Gen. Assembly, 1st Reg. Sess., Vol. 2 at 1072 (May 17, 1985) (emphasis added).

Moreover, the circumstances surrounding the adoption of Subsection 5 provide reason to believe that the General Assembly intended to allow counties to seek judicial review of the Department's decisions regarding the Contingency Fund. Subsection 5 was a part of House Bill No. 1376, enacted on June 11, 1985. *See* ch. 58, sec. 2, § 26–1–126(5), 1985 Colo. Sess. Laws 289, 290. House Bill No. 1376 was a reaction to our decision in *Colorado Department of Social Services v. Board of County Commissioners*, 697 P.2d 1 (Colo. 1985) ("*CDSS*"). In that case, Pueblo County's Board of County Commissioners (the "Board") brought a counterclaim against the Department seeking, *inter alia*, reimbursement for certain county overexpenditures for foster care costs due to a shortage of state funding. We held that the Board was not entitled to this reimbursement, but that the relevant statute "require[d] sufficient funding of the county contingency fund to fulfill the justifiable claims of counties eligible for such assistance." *Id.* at 23.

The General Assembly responded with House Bill No. 1376 to make clear three points: (1) legislation passed by one session of the General Assembly cannot bind future legislative sessions to appropriate any sums of money, *see* § 2–4–215, 1 C.R.S. (1997); (2) the General Assembly has absolute discretion to "determine annually the level of funding" in the Contingency Fund, and the existence of the Contingency Fund does not "result in any state liability for amounts not appropriated" to that fund, *see* § 26–1–126.5, 8 C.R.S. (1997); and (3) the appropriate response to a shortage of funds in the Contingency Fund is a reduction in the rate of state social services expenditures to be executed by the executive director of the Department, *see* Subsection 5.

Significantly, House Bill No. 1376 did not address the issue of a county's right to seek judicial review of the Department's decisions regarding the Contingency Fund. If the General Assembly had wished to completely eliminate this sort of judicial review initiated by a county, it certainly could have done so. The General Assembly chose instead to address only the appropriations issue. Indeed, the General Assembly would have had no need to address the appropriations issue unless it assumed that entities such as the Board in *CDSS* do have a right to seek judicial review in this context. This assumption by the General Assembly was reasonable in light of the holding in *CDSS*, in which the Board's right to seek judicial review was enforced. *See* discussion *infra* Part I.B.

Given these circumstances, it would have been quite peculiar for the General Assembly to enact legislation that explicitly granted a county standing to seek judicial review of the Department's decisions regarding the Contingency Fund. Because the General Assembly assumed that a county already possessed this standing, and implicitly intended this standing to continue after House Bill No. 1376, the General Assembly had no reason to affirmatively provide this standing through new legislation. To require an explicit legislative declaration of standing in these circumstances, as the majority does, is to elevate form over substance and frustrate legislative intent. I would hold that the County has satisfied the first requirement of standing because the County has identified legislative authorization for it to seek judicial review of the Department's decisions in this case.

In addition to satisfying the first requirement of standing, the County has established that its claims satisfy the *Wimberly* inquiry into standing. As noted above, a plaintiff must allege that it has suffered an injury in fact to a legally protected right. *See Wimberly*, 194 Colo. at 168, 570 P.2d at 539. The County's injury in fact is the $1,612,187 deficit it allegedly incurred as a result of the Department's failure to reduce the rate of social services expenditures in accordance with Subsection 5.

The County has also shown that this injury is to a legally protected right. As *Maurer*

explained, a plaintiff may satisfy this requirement in one of two ways. *See* 779 P.2d at 1325. The plaintiff may demonstrate that the harm allegedly suffered is protected against by a statutory or constitutional provision. *See. id.* The County has done this by demonstrating that a legislative intent to protect the county's interest in ensuring the Department's reduction of the level of state social services expenditures is fairly inferable from Subsection 5. Furthermore, the County has satisfied the second *Maurer* method of meeting this *Wimberly* requirement by also demonstrating that the General Assembly conferred upon the County the right to seek judicial review of the Department's decisions. *See id.*

### B.

As discussed above, I believe the legislature intended to allow entities such as the County to obtain judicial review of the Department's decisions in this context. In addition to this legislative grant of standing, I believe that our decision in *CDSS* must be considered. In that case, we addressed the merits of the Board's claims against the Department, thereby implicitly holding that the Board had standing to seek judicial review. *See CDSS*, 697 P.2d at 23.

The requirement that a plaintiff have standing to sue "ensures that the jurisdiction of the courts is exercised only when an actual case or controversy exists." *People v. Highland Irrigation Co.*, 893 P.2d 122, 127 (Colo. 1995). In this sense, the standing requirement is analogous to the existence of subject matter jurisdiction. *See Martin*, 191 Colo. at 109, 550 P.2d at 866 (plaintiff's lack of standing extinguished court's subject matter jurisdiction); *see also Farmers Insur. Exch. v. District Court*, 862 P.2d 944, 946 (Colo.1993) (trial court may not assume jurisdiction where plaintiff lacks standing). Thus, standing, like subject matter jurisdiction, cannot be conferred by the parties. *See Clinic Masters, Inc. v. District Court*, 192 Colo. 120, 123, 556 P.2d 473, 475 (1976). Accordingly, standing is a jurisdictional prerequisite to every case and may be raised at any stage of the proceedings, including on appeal. *See Peters v. Smuggler–Durant Mining Corp.*,

910 P.2d 34, 37 (Colo.App.1995), *aff'd*, 930 P.2d 575 (Colo.1997); *Adams v. Neoplan U.S.A. Corp.*, 881 P.2d 373, 374 (Colo.App. 1993); *City of Aspen v. Artes–Roy*, 855 P.2d 22, 23 (Colo.App.1993); *see also O'Bryant v. Public Utilities Comm'n*, 778 P.2d 648, 652 (Colo.1989) (standing is a "threshold issue").

Because standing is a jurisdictional prerequisite, a court may raise the issue *sua sponte* at any stage of the proceedings. *See CF & I Steel Corp. v. Colorado Air Pollution Control Comm'n*, 199 Colo. 270, 274, 610 P.2d 85, 88 (1980) (approving the court of appeals' decision to raise standing issue *sua sponte*); *see also Director v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 125, 115 S.Ct. 1278, 1282, 131 L.Ed.2d 160 (1995) (same); *Juidice v. Vail*, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977) (court obliged to raise standing issue *sua sponte*). Thus, by addressing the merits of a plaintiff's claims, a court implicitly holds that the plaintiff has standing to assert those claims, regardless of whether the parties raised the standing issue. *See People v. J.M.*, 854 P.2d 1346, 1350 (Colo.App.1992) (when court fails to raise jurisdictional issue and enters judgment on the merits, it is presumed that court determined that jurisdiction was proper).

In *CDSS*, the Board's claims against the Department were grounded in the Department's failure to reimburse the Board for certain social services expenditures. *See CDSS*, 697 P.2d at 18. We addressed the Board's claims and found that, while the Board was not entitled to reimbursement, the statute required the Contingency Fund to be fully funded. *See id.* at 19–23. Of course, by addressing the merits of the Board's contentions, we implicitly held that the Board had standing to assert them.

This view of *CDSS* is supported by the time-honored principle that "[e]very court in rendering a judgment tacitly, if not expressly, determines its jurisdiction over the parties and the subject matter." *Stoll v. Gottlieb*, 305 U.S. 165, 171–72, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938); *accord Corbett v. MacDonald Moving Services, Inc.*, 124 F.3d 82, 88 (2d Cir.1997); *Jackson v. Southern Ry. Co.*, 317 F.2d 532, 534 n. 1 (5th Cir.1963); *see also People v. J.M.*, 854 P.2d at 1350. Thus,

our decision that the Board had standing in *CDSS* cannot be ignored, even though this determination was rendered tacitly.

Given the interaction between the General Assembly and our decision in *CDSS, see* discussion *supra* Part I.A., I would decide this issue consistent with our implicit resolution of the standing issue in *CDSS*. "Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated," and the legislature remains free to alter what we have done. *Hilton v. South Carolina Pub. Rys. Comm'n*, 502 U.S. 197, 201, 112 S.Ct. 560, 563, 116 L.Ed.2d 560 (1991). As discussed above, the General Assembly's response to *CDSS* was to presume that entities such as the Board have a right to seek judicial review, and to prevent direct interference with the General Assembly's discretion to fund the Contingency Fund. *See* § 2–4–215; § 26–1–126.5. Because we assumed standing in *CDSS* without addressing the issue, *CDSS* does not have precedential value with respect to this issue and we are not bound by it. However, by reaching a conclusion which is inconsistent with our earlier assumption in *CDSS*, we are disrupting and frustrating the settled expectations of the General Assembly.

Therefore, today's decision by the majority is not consistent with our implicit determination of standing in *CDSS* and it changes the law as it has been reasonably perceived by the legislature since *CDSS* was decided. Because I would give effect to the legislature's intent and remain consistent with the expectation raised by *CDSS*, I dissent from the majority's holding.

## II.

In both of its complaints in this matter, the County seeks injunctive and declaratory relief, as well as reimbursement for its budgetary deficit. The Department contends that, issues of standing aside, the legislature has precluded entities such as the County from receiving such monetary awards. In support of this theory, the Department points to sections 2–4–215 and 26–1–126.5. As previously

explained, section 2–4–215 provides that one session of the General Assembly cannot bind future sessions to appropriate any sums of money. *See* § 2–4–215. In section 26–1–126.5, the legislature expressly rejected the notion that any specific General Assembly is required to fully fund the Contingency Fund, and rejected any implication "which would result in any state liability for amounts not appropriated for such fund." § 26–1–126.5.

In my view, neither of these sections addresses the issue of whether the County may eventually recover monetary damages in this case. The County does not allege liability resulting from the General Assembly's failure to appropriate certain amounts for the Contingency Fund. Rather, the County alleges liability resulting from the Department's failure to reduce the level of state expenditures to match funds appropriated for the Contingency Fund. According to the County, if the Department had properly performed its obligations under Subsection 5, the County would not have incurred the budgetary deficit.

Thus, the County does not seek to force the General Assembly to appropriate any particular sums for the Contingency Fund, but instead seeks to force the Department to react appropriately to the amounts actually appropriated by the General Assembly. Neither section 2–4–215 nor section 26–1–126.5 speaks to this issue. Furthermore, nothing in the plain language of these sections immunizes the state from any liability in any form for any reason. Rather, these sections address only liability that directly results from the General Assembly's failure to fund the Contingency Fund. As explained above, the County does not allege such liability. Accordingly, while I intimate no view on whether the County may actually receive injunctive, declaratory or monetary relief in this case after a hearing or trial on the merits, I emphasize that the statutes identified by the Department do not prohibit recovery of monetary damages.

### III.

The County has satisfied all of the requirements for a subordinate agency to seek judicial review of a decision by a superior state agency. Thus, I would hold that the County has standing to proceed with this litigation. I would affirm the judgment of the court of appeals and remand this case for a trial on the merits. Accordingly, I respectfully dissent.