YATES, Judge.
The plaintiffs, One Stop, Inc., Center Point 66 Service Station, and Robert Shaw, appeal from a judgment in favor of the defendants, the Alabama Department of Revenue, the Alabama Department of Environmental Management (“ADEM”), the Alabama Oilmen’s Association, and the Alabama Association of Convenience Stores.
In 1976, Congress enacted the Resource Conservation and Recovery Act (“RCRA”), to deal with solid and hazardous waste. In 1984, Congress enacted subchapter IX of the RCRA, which established a comprehensive scheme for the purpose of regulating underground storage tanks used to store motor fuels, and to address threats to public health and the environment posed by leaks from those tanks into the groundwater. 42 U.S.C. § 6991.
In 1986, Congress adopted the Superfund Amendments and Reauthorization Act (“SARA”), mandating that the Environmental Protection Agency (“EPA”) establish financial-responsibility requirements for underground-storage-tank owners and operators in order to take corrective action when a leak occurs and to compensate third parties for bodily injury and property damage resulting from the operation of underground storage tanks filled with petroleum.
Under federal law, owners and operators of underground storage tanks must demonstrate proof of financial ability to pay cleanup costs and third-party damages in the event of spillage or release from their tanks. The amount of financial responsibility a tank owner or operator is required to show depends upon the number of tanks owned: $500,000 for owners with 100 or fewer tanks and $1 million for owners with more than 100 tanks; and to be self-insured the tank owner or operator must have a tangible net worth of at least $10 million.
The administrator of the EPA may approve a state-administered underground-storage-tank program as a method of compliance with the federal enforcement scheme. The EPA administrator can approve the state program if it meets the requirements and standards set out in 42 U.S.C. § 6991c. The EPA established a phased-in program based upon an owner or operator’s ability to comply with the federal regulations. The EPA recognized *280 that many small gasoline-station owners and operators would have to rely on state-assurance funds in lieu of the federal requirements for financial responsibility.
In 1987, when SARA went into effect, mandating that the EPA establish financial-responsibility requirements, the Alabama legislature enacted its first version of the Alabama Underground Storage Tank Trust Fund Act (“USTA”). The legislature asked the supreme court for an advisory opinion as to whether House Bill 713, which imposed a $.002-per-gallon fee upon motor fuel and mandated that those moneys be held in a revolving trust fund to pay for cleanup costs and third-party claims caused by leaking storage tanks, violated Amendment 354 of the Alabama Constitution. Amendment 354 provides that moneys derived from any fees, excises, or license taxes relating to fuels, except pump taxes, shall be spent solely for highway projects. The supreme court held that House Bill 713 would violate Amendment 354 because protection of groundwater is not one of the circumstances set forth in the amendment, even if the groundwater is harmed by the leakage of motor fuels. Opinion of the Justices No. 324, 511 So.2d 505 (Ala.1987).
In 1992, the legislature again tried to create a state-assurance fund for the protection of Alabama’s groundwater. This time the legislature imposed a “pump tax” of $.003 per gallon on all motor fuel, including motor fuel imported into the state, as it passes through the first pump in the state on the first withdrawal from bulk, excluding pumps used for pipeline transmission. The legislature asked for an advisory opinion as to whether this method of funding the Underground Storage Tank Trust Fund violated Amendment 354. The supreme court held that because a $.003-per-gallon tax had been imposed on all fuels passing through the first pump in the state, the tax was on the fuel, not the pump. The court held that although the legislature had called the tax a “pump tax,” it was not a tax on the individual pumps of a seller, and that the bill would violate Amendment 354. The court stated that “[mjoney derived from a true pump tax could be used for the protection of groundwater contaminated by petroleum leaks.” Opinion of the Justices No. 337, 613 So.2d 393, 396 (Ala.1993).
In 1993, the legislature enacted the current version of the USTA. The plaintiffs’ claims in this lawsuit relate to the funding mechanisms of USTA. Section 22-35-5(a) and (b) set out two methods by which the trust fund receives money.
Section 22-35-5(a) provides, in pertinent part, that each owner of a tank:
“Shall pay an Underground and Above-ground Storage Tank Trust Fund fee as established by the provisions of this chapter to be paid to the department. During the first year next following October 1, 1998, the amount of the annual Underground Storage Tank Trust Fund fee shall be $100. Thereafter, the commission, upon recommendation of the advisory board shall set such an amount not to exceed $150 per year per regulated tank.”
In addition to the initial payments and annual fees mentioned above, § 22-35-5(a) provides that in the event of depletion of the moneys in the fund each owner may be required to pay a special assessment fee, the amount of which may not exceed $150 per regulated tank in any fiscal year. Failure to timely pay can result in a late-charge penalty, subject to the director’s discretion, of up to $100 per tank per day for each day the payment is delinquent. The Act further provides that the annual trust-fund fee shall abate when the amount in the trust fund reaches $10 million and shall be reimposed when the trust fund *281 balance is reduced to $7.5 million. § 22-35-5(e).
In addition to the fees in § 22-35-5(a), a charge is assessed on each withdrawal of motor fuel from bulk at a terminal. This means that when a distributor of motor fuel sends its tanker truck to a local bulk terminal to pick up a load of gasoline, the terminal operator charges the distributor with the cost of the gasoline, all applicable federal and state excise taxes, and a charge based on the number of gallons withdrawn. The charge is to be deposited in the trust fund.
The plaintiffs argued that the funding mechanisms of the USTA violate Amendment 354 of the Alabama Constitution. We note that the plaintiffs originally had filed their lawsuit as a class action and had sought a refund of all moneys paid under the Act. However, when the Alabama Oilmen’s Association and the Association of Convenience Stores intervened on behalf of the defendants, the plaintiffs withdrew their motion for class certification. At the trial, One Stop’s attorney contended that the lawsuit still could be treated as a class action if the USTA was later declared unconstitutional.
Trial testimony indicated that One Stop, Inc., is owned by James Ezell. Ezell operates three pumps at One Stop, but the storage tanks are owned by his gasoline supplier, Abston Oil, Inc. Abston Oil collects the charge and pays it to the Department of Revenue, and Abston also pays the annual fee on the storage tanks. Abston Oil does not support Ezell’s claims. Ezell owns two storage tanks taken from a gasoline station he had owned that is now closed. He testified that he has assets of $1 million and that he no longer wants to participate in the trust fund.[1]
The plaintiff Robert Shaw was the owner of the “Center Point 66” gasoline station. Shaw is currently involved in litigation with ADEM over a gas leak at his business. In 1996, ADEM discovered a leak on Shaw’s property. Also, the storage tank system was not in compliance with the applicable rules and regulations. Shaw was assessed a $20,000 penalty for noncompliance with ADEM’s regulations and was ordered to pay for the cleanup. Shaw stopped selling gasoline in 1996; he currently operates an automobile-parts store on the property. No cleanup has occurred. In his litigation with ADEM, Shaw is seeking to use moneys from the trust fund to pay for the cleanup of his property. He testified that when he sold gasoline, he would usually pass the cost of the USTA charge on to the consumer.
Sonja Massey, the chief of the groundwater branch at ADEM, testified that the $15 million that is currently in the trust fund is earmarked to pay for cleanups of other leaks around the state. Massey also testified that private insurance for storage tanks can cost $25,000 per year.
Bart Fletcher of the Alabama Oilmen’s Association testified that members of that association own between 70% and 80% of the storage tanks in Alabama. He stated that all the members participate in the fund.
The trial court held that demonstration of financial responsibility for cleanups is mandatory under federal law and that the plaintiffs could demonstrate financial responsibility in a number of ways, including private insurance, a surety bond, a letter of credit, a guarantee, self-insurance, or a state assurance fund as provided for in the USTA. The court further held that neither *282 federal law nor state law mandated a particular mechanism by which an owner or operator of a storage tank must satisfy the requirement. The trial court went on to state:
“The language of the Trust Fund statute as well as the applicable portions of RCRA that govern the underground and aboveground storage tank program in Alabama [shows] that the charge at issue for participation in the Trust Fund does not constitute a tax, fee or other charge, and the Trust Fund and its fee mechanism do not violate Amendment Nos. 93 and 354 of the Alabama Constitution. A tax is an enforced contribution exacted pursuant to legislative authority for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for a special privilege or a service rendered. Of course, the charge at issue gains the payor the privilege of participation in the Trust Fund, with its attendant benefits and services. But more fundamentally, the charge is not in any sense exacted; the owner or operator of a UST may participate in the Trust Fund and pay the necessary charge, or may opt not to participate and may fulfill the statutory obligations otherwise. Participation is, therefore, voluntary, and thus the payment of the charge is voluntary, and the owner or operator of a UST must initiate collection of the Trust Fund participation charge. As such, the Plaintiffs lack standing to challenge the constitutionality of the statute. Town of Camp Hill v. James, 686 So.2d 1208 (Ala.Civ.App.), cert. denied, 686 So.2d 1208 (Ala.1996). The essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority. 84 C.J.S. Taxation, § 1, p. 32 [(1954)]. A tax is not dependent on the will or assent of the person taxed. 71 Am.Jur.2d, State and Local Taxation, § 2, p. 344 [ (1973) ]. The fact that Plaintiffs are not required to participate in the Trust Fund in order to satisfy their statutory obligation of showing financial responsibility prevents the charge at issue from being considered a tax, and removes any standing of the Plaintiffs to bring this claim.”
In Town of Camp Hill v. James, 686 So.2d 1208 (Ala.Civ.App.1996), the town challenged a sales-tax discount given to retailers. This court determined that the town was required to pay the discount only if it had participated voluntarily in the program with the Department of Revenue whereby the Department handled the town’s collection of sales taxes. We held that the town’s injuries were “self-inflicted,” because the program was voluntary and the town therefore lacked standing to challenge the program. Based on Camp Hill, we must determine whether the fees were voluntarily paid in the present case.
The plaintiffs argue that the trial court erred in finding that the fees and charges paid under the Act were paid voluntarily. In support of their argument, the plaintiffs contend that the Act uses the word “shall” numerous times. The plaintiffs further argue that the regulations adopted by the Alabama Environmental Management Commission, pursuant to the Act, clearly specify that “the requirements of this chapter apply to all owners and operators of an UST (underground storage tank) or AST (aboveground storage tank) system as defined in 335-6-16.02 except as otherwise provided in paragraph 335-6-16.03(3) of this Rule.” § 335-6-16.03, ADEM Regulations. Although Regulation 335-6-16.03(3) exempts certain owners, operators, tanks, and facilities, nowhere does that regulation specifically exempt one who has otherwise provided proof of finan *283 cial responsibility under the federal statutes.
The plaintiffs also argue that the RCRA provides that states are allowed to adopt their own programs relating to the regulation of underground storage tanks and provides that once such a state program is approved by the EPA administrator, then the state program stands in lieu of the federal program. 42 U.S.C. § 6991. The plaintiffs contend that it was established in the trial court that the Alabama USTA was submitted to and approved by the EPA.
The defendants argue that participating in the fund is an alternative for satisfying the financial-responsibility requirements imposed by the Federal Government pursuant to the RCRA. The defendants argue that if a tank owner or operator chooses to provide a letter of credit, a guaranty, a surety bond, or self-insurance, he does not have to pay any of the trust-fund charges. They contend that the USTA is one of several options a tank owner or operator has by which to satisfy the RCRA.
The defendants argue also that the legislature has enacted two distinct statutes regarding underground storage tanks. The USTA, § 22-85-1 et seq., is limited to the establishment of the trust fund. The Alabama Underground Storage Tank and Wellhead Protection Act, § 22-36-1, establishes a program to regulate underground storage tanks in the state in lieu of federal regulation. Pursuant to § 22-36-1 et seq., the legislature delegated to the Alabama Environmental Management Commission the authority to promulgate rules to comply with the federal requirements. The EPA has approved these rules by finding that they are no less stringent than corresponding federal requirements and, therefore, that they apply in Alabama in lieu of federal regulation.
With regard to Alabama’s requirements for financial responsibility, the defendants cite § 22-36-3(3), which provides:
“The department, acting through the commission, is authorized to promulgate rules and regulations requiring the owner or operator of an underground storage tank to maintain evidence of financial responsibility for taking corrective action, providing alternate or temporary drinking water, and compensating third parties for bodily injury and property damages resulting from groundwater pollution caused by the operation of an underground storage tank only when such a requirement is mandatory for delegation of authority to the department to manage a Federal Regulatory Program and only to the extent required for delegation of that Federal Regulatory Program.”
(Emphasis added.) Because the Commission is bound on the one hand by federal law to be no less stringent and, on the other hand, by state law to be no more stringent, the Commission’s rule on financial responsibility adopts the federal rule by reference. Under ADEM Regulation 335-6-15.46, the Commission adopted by reference the portion of the RCRA that sets forth “the amount of financial responsibility required of petroleum UST owners and operators and the mechanisms allowed for satisfying these requirements.” The defendants argue, therefore, that all the mechanisms available for satisfying the financial-responsibility requirements under the federal program are included in Alabama’s program.
The defendants also argue that when the plaintiffs were required to register their storage tanks, they were required to specify which method of financial responsibility they had met. Listed on the form as options for financial responsibility were the trust fund, private insurance, guaran *284 tee or surety bond, and self-insurance. The defendants further argue that this fact supports their argument that compliance is voluntary.
Section 22-35-1 recognizes that the protection of Alabama’s groundwater is important. Section 22-35-1 goes on to provide:
“The Legislature further finds that where contamination of soils or waters has occurred, remedial measures have often been delayed for long periods while determinations as to liability and the extent of liability are made; that such delays result in the continuation and intensification of the threat to the public health, safety, and welfare, in greater damages to the environment, and in significantly higher costs to contain and remove the contamination; and that adequate financial resources must be readily available to provide for the expeditious supply of safe and reliable alternative sources of potable water to affected persons and to provide a means for investigation and clean-up at contamination sites without delay.
“The Legislature intends for this chapter to provide evidence of financial responsibility for owners and operators of underground and aboveground storage tanks under the Resource Conservation and Recovery Act, Subtitle I, the Superfund Amendments and Reauthori-zation Act of 1986 and other federal laws.”
We note that as result of the two previous advisory opinions, the legislature amended the USTA, not by adding a per-gallon tax on motor fuel, and not by increasing the existing pump or nozzle tax, but by imposing a charge on each withdrawal from bulk of motor fuel at the terminal facility. Although this is the first time the constitutionality of the current version of the USTA has been challenged and the first time any version of the USTA has been challenged by a party who has actually participated in the fund, our supreme court has, in another case, discussed the application of the Act.
In Sanders v. Warr, 646 So.2d 647 (Ala.1994), the issue was whether a third party, who claimed to have suffered property damage as a result of a substantial leak in an underground storage tank, can recover compensation for the damage from the trust fund created by the USTA. In that case, our supreme court recognized the need for state assurance programs, like the USTA, for small gasoline-station owners and operators, stating:
“Small marketers, such as Slocomb Oil Company, were scheduled for compliance by April 26,1990, because the EPA recognized that they would rely primarily on state assurance funds. However, on May 2, 1990, the EPA extended this compliance date to April 26, 1991, and later extended it to December 31, 1993. This schedule provided time for the development of state assurance programs. The EPA recognized that funds could provide an important means for compliance with financial responsibility requirements at the onset of the program, and the EPA encouraged the development of such funds.”
Id. at 649.
In Sanders, the court held that because the leak had occurred before the tank owners had to be in compliance with the USTA, the third party was not entitled to indemnification from the trust fund created by the USTA. The court stated:
“The Trust Fund was established by the legislature as a state assurance fund. It is a mechanism that allows all owners and operators of underground storage tanks to meet the financial responsibility requirements of Subtitle I. We agree with the director that the legislature *285 intended to tie the indemnification limits for eligible third-party claims against the Tank Trust Fund to those tank owners and operators in compliance with the financial responsibility requirements of Subtitle I of the RCRA.”
646 So.2d at 651.
First, participation in the USTA is voluntary and payment of the charge made pursuant to that Act is also voluntary. The plaintiffs have no standing to sue, because they could have avoided the payment of the charge by simply relying on another mechanism to satisfy the federal financial-responsibility requirements. The trust fund is a means by which the owner or operator of a storage tank can satisfy the federally mandated financial-responsibility requirements of the RCRA. The plaintiffs’ injury — payment of the charge— was not caused by the statute, but rather by the plaintiffs’ reliance on the trust fund as a mechanism for meeting the federal requirements. Town of Camp Hill, 686 So.2d 1208.
Standing turns on “ “whether the party has been injured in fact and whether the injury is to a legally protected right.’ ” State v. Property at 2018 Rainbow Drive, 740 So.2d 1025, 1027 (Ala.1999), citing Romer v. Board of County Comm’rs of the County of Pueblo, 956 P.2d 566, 581 (Colo.1998) (Kourlis, J., dissenting). In the present case, the plaintiffs suffered no injury to a legally protected right, because they made a voluntary payment.
Even if one assumed that the plaintiffs had standing to challenge the constitutionality of the Underground Storage Tank Trust Fund Act, their payments still would be voluntary, as discussed above. Amendment 354 provides that motor-fuel-tax revenue “levied by the state” is to be spent for highway projects only. The plaintiffs are arguing that the Act violates the earmarking provisions of Amendment 354. However, the plaintiffs’ voluntary participation prevents their payments from being considered moneys “levied by the state” within in the meaning of Amendment 354.
A Georgia case, Luke v. Department of Natural Resources, 270 Ga. 647, 513 S.E.2d 728 (1999), is persuasive on this issue. In Luke, the plaintiff, the owner and operator of an underground storage tank, challenged the constitutionality of the funding mechanism of the Georgia Underground Storage Tank Act. The Georgia Act was funded from a “fee set by the Board of Natural Resources, not to exceed 1.0$ per gallon. OCGA § 12-13-10(a).” 270 Ga. at 647, 513 S.E.2d at 729. Article III, Section IX, Paragraph VI(b), of the Georgia Constitution of 1983 provides that “An amount equal to all money derived from motor fuel taxes received by the state ... is hereby appropriated ... for all activities incident to providing and maintaining an adequate system of public roads and bridges in this state ... and for grants to counties by law authorizing road construction and maintenance.... ”
The Georgia Supreme Court held:
“The trial court correctly ruled that the language of the statute shows that fees for participation in the Fund do not constitute a tax, and the Fund and its fee mechanism therefore do not violate Art. Ill, Sec. IX, Par. VI. ‘A tax is an enforced contribution exacted pursuant to legislative authority for the purpose of raising revenue to be used for public or governmental purposes, and not as payment for a special privilege or a service rendered.’ Gunby v. Yates, 214 Ga. 17, 19, 102 S.E.2d 548 (1958). Of course, the fee at issue gains the payor the privilege of participation in the Fund, with its attendant benefits and services. But more fundamentally, the fee is not *286 in any sense exacted; the owner or operator of a UST [underground storage tank] may participate in the Fund, and pay the necessary fee, or may opt not to participate and may fulfill the statutory obligations otherwise. Participation is therefore voluntary, and the owner or operator of a UST must initiate collection of the Fund participation fee. ‘[T]he essential characteristics of a tax are that it is not a voluntary payment or donation, but an enforced contribution, exacted pursuant to legislative authority.’ 84 [C.J.S.], Taxation § 1, p. 32. A tax is not dependent on the will or assent of the person taxed. 71 [Am. Jur.2d], State and Local Taxation, § 2, p. 344. The fact that the [plaintiff] is not required to participate in the Fund in order to satisfy his statutory obligation of showing financial responsibility prevents the fee at issue from being considered a tax.”
270 Ga. at 648, 513 S.E.2d at 729.
The plaintiffs argue that Luke can be distinguished from the present case because the Georgia funding mechanism was a fee, not a tax, and the Georgia Constitution earmarked only motor-fuel taxes as revenue for Georgia highway projects. This is not a valid distinction. Amendment 354 provides that “no moneys derived from any fee, excises, or license taxes, levied by the state, relating to fuels” are to be used for anything other than highway projects. It is the clause “levied by the state” that is dispositive. Whether one calls the payment a fee, an excise, or a tax, it still must be one “levied” or exacted by the state. The plaintiffs’ voluntarily participating in the USTA, instead of relying on another mechanism to satisfy the federal financial-responsibility requirements, prevents the fee they pay from being one “levied by the state,” as contemplated by Amendment 354.
Accordingly, the judgment is affirmed.
AFFIRMED.
CRAWLEY and THOMPSON, JJ., concur in the result.
ROBERTSON, P.J., dissents.
MONROE, J., not sitting.

. Under the federal regulations, if Ezell did not participate in the fund, he would have to have private insurance, a surety bond, or a letter of credit. He would not be eligible for self-insurance, because his net worth is less than $10 million.